BILLINGSLEY v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. March 31, 1910.)

No. 3,021.

1. INDICTMENT AND INFORMATION (§§ 11, 22*)—FORMAL REQUISITES—NAME OF COURT.

Since the territorial courts of Oklahoma exercised a dual criminal jurisdiction, one over offenses against the United States and the other over offenses against the territory. it was not improper for indictments returned in such court for federal crimes to recite that they were found by grand jurors of the "United States" within and for a particular county; nor was it improper that the minutes of the court recited that the indictments were returned to the "United States" District Court of Logan County,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Oklahoma Territory, when in fact the grand jurors were territorial grand jurors and the court a territorial court.

[Ed. Note.—For other cases, see Indictment and Information, Dec. Dig. §§ 11, 22.*]

2. CRIMINAL LAW (§ 107*)—VENUE—BILL OF RIGHTS—TRIAL IN THE PLACE OF COMMISSION OF CRIME.

Const. Amend. 6, providing that in all criminal prosecutions accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district where the crime shall have been committed, etc., is inapplicable to offenses committed in a territory.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 219; Dec. Dig. § 107.*]

3. CRIMINAL LAW (§ 107*)—VENUE—CONSTITUTIONAL RIGHTS.

Const. art. 3, § 2, provides that, when crimes are not committed within any state, the trial shall be at such place or places as the Congress may by law have directed, and Oklahoma Amended Enabling Act March 4, 1907, c. 2911, 34 Stat. 1286. provides that pending prosecutions for offenses theretofore committed in territorial times shall be transferred and thereafter conducted in the Circuit or District Court for the district in which they were committed. Held, that the creation of judicial districts by the new state on its admission into the Union was intended to supersede the old territorial subdivisions, and to supersede for jurisdictional purposes the new districts for the old territorial counties and enlarge the area of jurisdiction accordingly, so that an offender, having been indicted for an offense committed within the Western district of Oklahoma, was only entitled to a trial within that district, and not within the county in which the offense was committed.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 219; Dec. Dig. § 107.*]

4. BANKS AND BANKING (§ 257*)—NATIONAL BANKS—OFFENSES—FALSE ENTRIES—INDICTMENT—INTENT TO DECEIVE.

An indictment charging a bank officer with false entries "with the intent to deceive any agent appointed to examine the affairs of the bank" sufficiently designated the person intended to be deceived.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 971; Dec. Dig. § 257.*]

5. BANKS AND BANKING (§ 257*)—NATIONAL BANKS—OFFENSES—FALSE ENTRIES—DESCRIPTION OF BOOK.

In a prosecution of a national bank officer for making false entries, an allegation that they were made "in a book of said bank known as 'Journal K'" sufficiently alleged that the book was a book of the association within Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497), prohibiting the making of false entries in any book of an association to injure or defraud it or to deceive any officer thereof or agent appointed by the Comptroller to examine the bank's affairs, etc.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 971; Dec. Dig. § 257.*]

6. BANKS AND BANKING (§ 257*)—NATIONAL BANKS—FALSE ENTRIES—STATUTES—CONSTRUCTION.

Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497). declares that every president, director. cashier, etc., of any banking association, who embezzles any of its funds, or who makes any false entry in any book, report, or statement of the association with intent in either case to injure or defraud the association, or to deceive any officer or any agent appointed by the Comptroller, etc., shall be guilty of a misdemeanor. Held, that such section contemplated two separate intents, one to injure or defraud the association, and the other to deceive, either of which, when accompanying a forbidden act, constitutes an offense, and hence it was not necessary that an indictment alleging a false entry with intent to deceive should

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

also charge an intent to injure or defraud the association or any other company or person.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. § 971; Dec. Dig. § 257.*]

**7. BANKS AND BANKING (§ 257*)—NATIONAL BANKS—FALSE ENTRIES—OFFENSES—CONVICTION—EVIDENCE.**

In a prosecution of a national bank officer for making false entries in the bank's books, evidence *held* to sustain a conviction.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 257.*]

**8. INDICTMENT AND INFORMATION (§ 203*)—CONVICTION ON SEVERAL INDICTMENTS—APPEAL—REVIEW.**

Where the judgment and sentence under all the consolidated indictments on which accused was tried were the same and ran concurrently, the judgment would not be reversed on appeal if any of the indictments were good and sustained by the proof.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. § 651; Dec. Dig. § 203.*]

**9. BANKS AND BANKING (§ 256*)—NATIONAL BANKS—FALSE ENTRIES—REAL TRANSACTION.**

Officers of a national bank may not make a false entry in the bank's books with intent to deceive in violation of Rev. St. § 5209 (U. S. Comp. St. 1901, p. 3497), and escape criminal liability because they go through the idle and deceitful form of making a transaction to which the entry might nominally but not really relate.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 256.*]

In Error to the District Court of the United States for the Western District of Oklahoma.

Charles E. Billingsley was convicted of violating the national banking law, and he brings error. Affirmed.

J. C. Robberts and John Devereux (John J. Hildreth and J. F. Curran, on the brief), for plaintiff in error.

John Embry, for the United States.

Before HOOK and ADAMS, Circuit Judges, and AMIDON, District Judge.

ADAMS, Circuit Judge. This is a writ of error to review a judgment of the District Court for the Western District of Oklahoma against plaintiff in error for violating the national banking laws.

1. He was indicted in March, 1906, before Oklahoma became a state. The indictments, of which there were four or more, disclosed on their faces that the proceedings occurred in the "District Court of the First Judicial District in and for the County of Logan and Territory of Oklahoma"; that county being the one in which the offenses were alleged to have been committed. The proceedings, therefore, were in the court having actual jurisdiction over the alleged offenses. The indictments recite that they were found by "grand jurors of the United States within and for said county," and the minutes of the court recite that they were returned into "the United States District Court of Logan County, Oklahoma Territory." Objections are now made by the defendant that because territorial grand jurors were not, accurately speaking, "grand jurors of the United States," and because

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the territorial courts were not, accurately speaking, District Courts "of the United States" (Clinton v. Englebrecht, 13 Wall. 434, 20 L. Ed. 659), the indictments were not found by any lawful grand jury or returned into any legally constituted court.

The fact that the territorial courts exercised a dual criminal jurisdiction, one over offenses against the United States and the other over offenses against the territory, rendered it not inapt to add the words "United States" in describing the former, to indicate that the jurisdiction invoked was one to enforce the laws of the United States as distinguished from those of the territory. This seems to have been a harmless kind of a practice indulged for convenience sake, and the objection to it, as a ground for reversal, is, in our opinion, untenable.

2. The enabling act approved June 16, 1906 (34 Stat. 267, 275, c. 3335, U. S. Comp. St. Supp. 1909, p. 154), provided that the state of Oklahoma, when admitted into the Union, should constitute two judicial districts to be known as the "Eastern" and "Western" districts; the former to comprise what was formerly the Indian Territory and the latter what was formerly the Oklahoma Territory. It was provided that Circuit and District Courts in the Western District should be held in Guthrie, Oklahoma City, Enid, and Lawton.

· The amended act of March 4, 1907 (34 Stat. 1286, c. 2911), provided that:

"Prosecutions for all crimes and offenses committed within the territory of Oklahoma or in the Indian Territory, pending in the District Courts of the Territory of Oklahoma or in the United States Courts in the Indian Territory, upon the admission of such territories as a state, which, had they been committed within a state, would have been cognizable in the federal courts, shall be transferred to and be proceeded with in the United States Circuit or District Court established by this act for the district in which the offenses were committed, in the same manner and with the same effect as if they had been committed within a state."

Pursuant to these provisions, the present prosecutions were duly transferred to the District Court of the United States for the Western District of Oklahoma. The first ensuing term of that court was held at ·Guthrie, in Logan county, within which the offenses were alleged to have been committed. The court at that term, on motion of the defendant, continued the causes "to the next term of said court to be begun and held at Oklahoma City in said district on the second day of March, 1908." At the coming in of that term the defendant appeared and moved to remand the causes to Guthrie for trial on the ground that he was entitled to be tried in the county wherein his offenses were alleged to have been committed. This motion was denied, and the action of the court in so doing is assigned for error.

In support of this assignment, defendant invokes the provisions of the organic act of the territory (Wilson's Rev. & Ann. St. 1903, pp. 75, 76) that the territory shall be divided into three judicial districts, that a District Court shall be held in each county of the district, and that all offenses committed in the territory shall be prosecuted and tried within the county where committed, and also the sixth amendment to the Constitution of the United States, which ordains:

"That in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the state and district where the crime shall have been committed, which district shall have been previously ascertained by law."

The defendant having committed the offenses in question within a territory as distinguished from an organized state renders the sixth amendment inapplicable, and he cannot invoke its provisions for his protection. United States v. Dawson, 15 How. 467, 488, 14 L. Ed. 775; Jones v. United States, 137 U. S. 202, 211, 11 Sup. Ct. 80, 34 L. Ed. 691; Cook v. United States, 138 U. S. 157, 181, 11 Sup. Ct. 268, 34 L. Ed. 906.

In the amended enabling act (34 Stat. 1286) Congress, apparently acting under article 3, § 2, of the Constitution, which provides that when crimes are not committed within any state "the trial shall be at such place or places as the Congress may by law have directed," dealt with the new condition of things brought about by the admission of the territories in question into the Union and designated a place for the trial of criminal actions. It provided that pending prosecutions for offenses theretofore committed in territorial times should be transferred and thereafter conducted in the Circuit or District Court for the district in which they were committed. This means that the creation of judicial districts by the new state was intended to supersede the old territorial subdivisions, to substitute for jurisdictional purposes the new districts for the old territorial counties and enlarge the area of jurisdiction accordingly. Pickett v. United States (decided Feb. 21, 1910) 216 U. S. 456, 30 Sup. Ct. 265, 54 L. Ed. ——.

We held in Clement v. United States, 79 C. C. A. 243, 149 Fed. 305, and Spencer v. United States, 95 C. C. A. 60, 169 Fed. 562, that, when a judicial district has been established or "ascertained" by law, a jury may be lawfully drawn from any portion of the territory constituting such district regardless of the particular subdivision thereof in which for convenience a trial may be had.

We conclude, therefore, that defendant suffered no deprivation of any constitutional right by being compelled to proceed to trial at the Oklahoma City term of the District Court.

Before taking up other assignments, it may be well to state that out of many indictments which were returned against the defendant four went to trial. Each charged that he, as president, and one Robb, jointly indicted with him as vice president, made a false entry in a book of the Capitol National Bank of Guthrie, Okl., "with the intent to deceive any agent appointed to examine the affairs of the bank," in violation of the provisions of section 5209 of the Revised Statutes (U. S. Comp. St. 1901, p. 3497). These four indictments were consolidated for trial and a trial was had resulting in a verdict in each case of guilty as to Billingsley and not guilty as to Robb. These indictments were known throughout the trial and will be hereafter referred to as Nos. 161, 162, 172, and 178.

No. 161 contained two counts upon the second of which only defendant was found guilty. The other indictments contained one count only, and defendant was found guilty on each of them. He was sen-

178 F.—42

tenced to a term of imprisonment on each indictment—all to run concurrently.

3. The next assignment of error is that the court erred in overruling a general demurrer to the second count of indictment No. 161 for the reason that it did not specifically enough designate the agent intended to be deceived by the false entry. The court charged that defendants made the entry "with the intent to deceive any agent appointed under the laws of the United States to examine the affairs of the said bank."

In the case of United States v. Britton, 107 U. S. 655, 2 Sup. Ct. 512, 27 L. Ed. 520, where this character of averment was under consideration, Mr. Justice Woods, speaking for the Supreme Court, said:

"It appears from this section (5240 [U. S. Comp. St. 1901, p. 3516]) that the appointment of these agents is not permanent, but occasional and temporary, and that the appointments are made as often as shall be deemed necessary and proper. It is, therefore, apparent that the statute which punishes false entries, made with intent to deceive such agents, refers to any entries, made with that intent, whether before or after the appointment of the agent. * * * The agents are often purposely appointed without notice to the association."

The indictment in that case charged that the false entry was made to deceive "any agent who might be thereafter appointed by the Comptroller of the Currency to examine the affairs of said association." That is not essentially different from the charge in the present case.

In view of the object sought to be accomplished by the appointment of agents to examine national banks and the uncertainty as to times of appointment or persons to be appointed, it seems impossible that an officer could have in mind any particular person so as to intend to deceive any particular examiner. The intent to deceive would seem necessarily to have for its object any person appointed or to be appointed as such examiner. The charge in this count is in the language of the statute. It contains every element of the offense denounced by it and in our opinion is as specific as the nature of the case permitted.

4. It is next argued that the second count of indictment 161 is insufficient because it failed to state that the book in which the false entry was made was in the use of the bank, or that it ever had been in the use of the bank.

The language of the count in this regard is this: Defendant "did make in a book of said bank known as 'Journal K' a certain false entry, to wit: * * *" We think this was a sufficient allegation that it was a "book * * * of the association" within the meaning of section 5209.

To sustain defendant's contention on this point would, in the language of Mr. Justice Woods in the Britton Case, "carry refinement in criminal pleading to an impracticable extent."

5. It is next contended that the demurrer to this same count should have been sustained because it is not alleged that the false entry was made with intent to injure or defraud the association or any other company or person.

Section 5209 enacts that:

"Every president, director, cashier," etc., * * * "who embezzles * * * or who makes any false entry in any book, report, or statement of the association, with intent, in either case, to injure or defraud the association," etc., "or to deceive any officer of the association, or any agent appointed," etc., * * * "shall be deemed guilty of a misdemeanor."

There are apparently two separate intents contemplated by this section, either of which when accompanying a forbidden act constitutes an offense. One of them is the intent "to injure or defraud" and the other the intent "to deceive." The contention that there can be no offense in making a false entry with the intent to deceive an agent appointed to examine the affairs of the association unless there be also the coexisting intent to injure or defraud the association, etc., seems to ignore the grammatical structure of the statute and the natural meaning of the language employed. Either the intent to injure or defraud or the intent to deceive, when accompanying the doing of the substantive act to which they appropriately pertain seem, according to the language employed, to constitute an offense. Any other construction would, in our opinion, give practical immunity to the making of a false entry with the intent to deceive, etc. We understand the object of the law was to enable the Comptroller of the Currency, through an examiner appointed by him, to ascertain from time to time the true condition of a bank not only for the purpose of detecting offenses that might have been committed, but for the purpose of keeping the bank in line with the requirements of the statute, correcting improper practices if found to exist, and thereby preventing infractions of the law. United States v. Corbett (decided December 6, 1909) 215 U. S. 233, 30 Sup. Ct. 81, 54 L. Ed. ——. If it constitutes no offense to make a false entry with intent to deceive an examiner, unless an intent actually exists to also injure or defraud somebody, it would seem that much of the corrective purpose of the law can be thwarted.

We would not have deemed it necessary to dwell on this proposition except for the contention of defendant's counsel that the United States Circuit Court of Appeals for the Sixth Circuit, in McKnight v. United States, 49 C. C. A. 594, 111 Fed. 735, and the United States Supreme Court, in United States v. Britton, supra, have taken a different view. In the former case the Court of Appeals said:

"These acts [made criminal by section 5209] are defined to include embezzlement, abstraction or willful misapplication of the moneys, funds, or credits of the association, * * * or making any false entry in any book, report, or statement to the association, with intent, in either case, to injure or defraud the association, etc. 'In either case' obviously includes all or any of the acts which have been previously denounced as criminal when done by one of the officers named, and one of them is embezzlement of the moneys, funds, or credits of the association. These acts are criminal only when done with the intent which the statute has made an essential element of the offense. * * * United States v. Britton, 107 U. S. 655 [2 Sup. Ct. 512, 27 L. Ed. 520], * * * in which case the Supreme Court said that the intention to injure and defraud is an essential ingredient to every offense specified in the section, and the failure to aver the intent is a fatal defect in the counts in which it occurs."

We do not think the natural meaning of the language employed in section 5209 fairly warrants the interpretation placed upon it in the

McKnight Case. The words "with intent in either case to injure or defraud the association" precede the disjunctive clause "or to deceive any officer of the association or any agent appointed," etc., and it seems to us that the verb "to deceive" is so referable to the antecedent "with intent" as to subject any one who makes a false entry to the penalties of the law provided he makes it with the intent either to injure or defraud, etc., or to deceive, etc. The McKnight Case was one in which embezzlement with the intent to injure and defraud the bank was charged. The trial court held that the defendant might be convicted without proof of the intent charged. The Court of Appeals reversed the judgment and held that proof of the intent to injure or defraud was necessary. Most obviously that was right, and, as that was the gist of the case, any general observations like these quoted are at best but obiter dicta.

In the Britton Case the first 35 counts charged the making of false entries with intent to deceive "any agent who might be thereafter appointed by the Comptroller of the Currency to examine the affairs of the association." Other counts charged misapplications of funds with intent to injure and defraud the association. In some of the latter there was no averment of intent to defraud or of any other intent. One of the questions certified to the Supreme Court for its advice was:

"Whether those counts, which cover alleged false entries, sufficiently state an offense under section 5209."

As already stated, those counts each charged the making of specific false entries with intent to deceive any agent who might be thereafter appointed, etc. The Supreme Court, in answering that question, said:

"We are of opinion that none of the objections raised to the first 35 counts are well taken. They are refined and unsubstantial, and not sustained by the rules of criminal pleading in cases of misdemeanor, or by the fair construction of the statute on which the indictment is based. These counts embody the language of the statute; they charge every element of the offense created by the statute with sufficient certainty, and give the defendant clear notice of the charge he is called on to defend. They are, therefore, sufficient."

This, we think, is a conclusive answer to the contention that the Supreme Court held that an allegation of an intent to injure or defraud was an essential ingredient to every offense specified in section 5209. That no such rule was intended is also manifested by what was elsewhere in the opinion said, namely:

"Its (the law's) purpose is clear, to punish all false entries in the books of the bank, no matter when made, if made with intent to defraud the association or deceive the examiner."

The expression particularly relied on by defendant's counsel in the Britton Case is this:

"The counts last mentioned, as well as the counts numbered from 56 to 76, inclusive, are bad for the further reason that they fail to aver any intent to injure and defraud mentioned in section 5209. The intent to injure and defraud is an essential ingredient to every offense specified in the section, and the failure to aver the intent is a fatal defect in the counts in which it occurs."

The counts there referred to were based on misapplication of funds and contained no allegation of any intent to injure or defraud or any other intent whatsoever. Because of this fact, and because the natural intent characterizing a misapplication is to injure or defraud, it is not unreasonable that the Supreme Court limited its observation made with respect to such counts to the intent to injure and defraud alone. The language employed must be read in the light of the subject-matter under consideration, and, when so read, its true interpretation is made manifest.

In view of the foregoing, we cannot regard the Britton Case as authority for the contention now made. And if it be true that in the McKnight Case the contention was sustained we are forced to record our disapproval of it.

Our conclusion is in harmony with what we observed in the Clement Case, supra, where we said:

"The act (5209) in terms contemplates the appointment of such agents as specifically provided for by section 5240, and, although the report is made to the Comptroller, yet if the intent in making a false entry is to deceive an examiner who, every officer of a bank knows, may be appointed to make an examination for the information of the Comptroller, it is sufficient by itself to constitute an offense, irrespective of the existence of any of the other intents disjunctively mentioned in the act."

To the same effect, also, see United States v. Allis (C. C.) 73 Fed. 165.

6. At the close of the evidence the court was requested to instruct a verdict of acquittal on indictments Nos. 162, 172, and 178, and its refusal to do so is assigned for error. The facts involved in 172 are similar in their legal significance to those involved in the second count of 161. In the latter there was no request for an instructed verdict; as to that, counsel relied upon the several legal propositions already discussed. We will, however, briefly advert to the facts.

Prior to April, 1903, the Capitol National Bank carried among its bills receivable a demand note of one J. C. Robb. This asset met with the disapproval of the Comptroller, and on April 4, 1903, in order to satisfy the requirement of that functionary, the defendant Billingsley pretended to sell the note to the Citizens' Bank of McCloud. He caused an entry to be made on the books of his bank debiting the account of the Citizens' Bank with $10,000 and crediting its "Demand Loans" account with that sum. This made an ostensible showing that the condemned note had been actually sold to the Citizens' Bank for $10,000 in cash and that this sum of money had been received by the Capitol Bank in place of the Robb note. The evidence very satisfactorily shows that this was a sham transaction of the baldest sort, conducted without the knowledge or consent of the Citizens' Bank—a mere false bookkeeping entry to deceive the examiner—and thereby satisfy the demands of the Comptroller. It appears that a year thereafter when the Capitol Bank was about to fail this Robb note was taken from an envelope in the custody of defendant Billingsley, charged back to the "Demand Loans" account, and credited to the Citizens' Bank. Without detailing the facts further, it is very clear that the verdict of the jury on this second count of indictment 161 was well warranted.

The main facts appertaining to indictment 172 are these: Billingsley caused the individual account of J. C. Robb, vice president of his bank, which was then largely overdrawn, to be credited with $19,000. Robb and Billingsley were respectively the president and treasurer of the Oklahoma Sanitarium Company, a corporation, which carried an account in their bank. The evidence tends to show that these officers without authority of the sanitarium company executed its note in the sum of $15,000 payable to the order of the Capitol National Bank; that the sanitarium company at that time had an account amounting to $4,189.23 against the territory of Oklahoma; that defendant Billingsley pretended to discount the note and account and to place the proceeds, $19,000, to the credit of Robb. An entry of this transaction was the false entry complained of in indictment 172.

The sanitarium company owed Robb nothing. Its note, therefore, in the most favorable aspect which can be taken of the case, was unauthorized by any governing board, was made for the accommodation of Robb and Billingsley, or both, and was without any consideration moving from the bank to the sanitarium company. Of these facts the bank through its officers had full knowledge. The note and account were, therefore, voidable and worthless in the hands of the bank as claims against the sanitarium company. Without further specification it may be said, notwithstanding the claim advanced by witness Robb that the bank officers expected to use the proceeds of the discount for the benefit of the sanitarium company, that the evidence tended strongly to show that the transaction was fraudulent and fictitious, and that the entry in question made in the bank's book constituted a false showing of an asset when none in reality existed. It was a mere sham, and the jury was well warranted in so finding.

The facts relating to indictments Nos. 162 and 178 strongly indicate the making of certain original false entries by authority of defendant Billingsley with intent on his part to deceive an examiner. These entries were subsequently as the exigency of bookkeeping required repeated, and these repetitions are the false entries which form the basis of the last-mentioned indictments.

Defendant contends that there is no evidence showing that he personally directed the repetition of these false entries. We cannot agree to this. The original entries were of such a character and made for such a purpose that an inference is reasonable, if not quite irresistible, that their subsequent repetition was for the sole purpose of carrying out the original design to deceive. There is in our opinion substantial evidence that defendant knew and intended that his subordinates would continue to make the false entries which he had originally authorized until he should give directions to the contrary. The question of the authorship or responsibility for the repeated entries was fairly left to the jury, and its affirmative finding on that issue we think is supported by substantial proof.

But if we are mistaken about this it would be without prejudice to the defendant. The judgment and sentence under all of the consolidated indictments were the same, and ran concurrently. If, therefore, any of them were good and sustained by the proof, it would be sufficient to support the practically single judgment and sentence

which was actually imposed by the court below. Clement v. United States, supra, and cases cited; Tubbs v. United States, 44 C. C. A. 357, 105 Fed. 59; Lehman v. United States, 61 C. C. A. 577, 127 Fed. 41; Ripper v. United States (just decided by us) 178 Fed. 24.

7. Again it is contended that the trial court erred in refusing to give the following instruction requested by defendant:

"The jury are instructed that the offense of making false entries in the books of a national bank is a concrete offense, and, if the entry is the record of a transaction which actually took place, it is not a false entry within the statutes, no matter what the intent was of the person or persons making or directing the entry to be made."

The court refused to give this instruction and charged the jury in lieu thereof as follows:

"Now the jury may not have thoroughly understood the court in that respect. I do desire to charge you, gentlemen, that a 'false entry' is one that is made which is untrue and falsely states the condition of the banking association. Now it don't matter whether the entry was of a transaction which occurred or not. If it was a bona fide transaction, it is not a false entry; but, if the entry was false in itself and was done for the purpose of misstating the true condition of the bank, it don't matter whether the record is of the transaction as it occurred or not. The question is whether it was with the intent of misstating or stating falsely the condition of the bank with another."

Of course the instruction asked could have no pertinency to the second count of indictment 161. That involved the false entry of a credit of $10,000 to Robb's account without the receipt of any money or valuable thing from Robb or any one in his behalf. It was a clear case of an entry false in fact and false in intent. The same may also be said with respect to the entry of the credit of $19,000 to the personal account of J. C. Robb involved in indictment 172. The requested instruction, therefore, could have had no appropriate bearing upon the facts of those two indictments which were good in themselves and amply sustained by the proof. In any phase of the case, therefore, the refusal of the instruction and the giving of the charge complained of was without prejudice to the defendant.

But we think the court properly refused the request made. It cannot be the law that officers of a bank may make a sham entry with the intent to deceive, and yet, merely because they go through the idle and deceitful form of making a transaction to which the entry might nominally but cannot really relate, protect themselves from the consequences of their real conduct. Such a holding would facilitate the vicious practice condemned by law. We took occasion to say in Hayes v. United States, 94 C. C. A. 449, 169 Fed. 101, on this subject as follows:

"It may be conceded that if the officers of the bank procure a note to be given to the bank by an irresponsible person, with the intent of apparently, but not really, magnifying the bank's assets, and should thereafter make an entry in a report required by law to be made to the Comptroller of the Currency, including such note as a bona fide asset of the bank, with either of the intents denounced by section 5209, such an entry, even though of a paper in actual existence, would be a false entry, within the meaning of section 5209."

We think, in view of the facts of the present case, the court's charge cannot properly be complained of by the defendant. It presented the law as favorably to him as the case warranted.

Assignments of error not already considered and passed upon have been examined and found untenable.

The judgments must be affirmed.